September 22, 2005

Honorable Thomas P. Griesa
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    <u>United States v. Carlos Duarte</u><br>03 Cr. 1393 (TPG)

Dear Judge Griesa:

This letter is submitted for Your Honor's consideration in the sentencing of Carlos Duarte, who will be sentenced by this Court on September 29, 2005.

While the United States Sentencing Guidelines are no longer mandatory, this new sentencing landscape can be beneficial to Mr. Duarte given his offense level. Despite Probation's calculation of his Total Offense Level of 33 and Criminal History Category of I, the defense does <u>not</u> believe that a range of imprisonment of 135-168 months accurately reflects Mr. Duarte's conduct or personal background. In addition, while there are no circumstances that would have necessarily risen to the level of a downward departure prior to <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), there are mitigating factors in Mr. Duarte's case which should be taken into consideration by Your Honor in fashioning an appropriate sentence.

## GUIDELINES CALCULATION

**Business of Laundering Funds**

Both the government and Probation have enhanced Mr. Duarte's guidelines by four levels as they believe that he was in the business of laundering funds pursuant to U.S.S.G. §2S1.1(b)(2)(C). The Commentary to U.S.S.G. §2S1.1 lists specific factors to be considered in determining the appropriateness of such an enhancement. This non-exhaustive list includes:

(i)    The defendant regularly engaged in laundering funds.

Hon. Thomas P. Griesa

September 22, 2005

    (ii)       The defendant engaged in laundering funds during an extended period of time.

    (iii)     The defendant engaged in laundering funds from multiple sources.

    (iv)     The defendant generated a substantial amount of revenue in return for laundering funds.

    (v)      At the time the defendant committed the instant offense, the defendant had one or more prior convictions for an offense under 18 U.S.C. §1956 or §1957, or under 31 U.S.C. §5313, §5314, §5316, §5324 or §5326, or any similar offense under state law, or an attempt or conspiracy to commit any such federal or state offense.

    (vi)     During the course of an undercover government investigation, the defendant made statements that the defendant engaged in any of the conduct described in subdivisions (i) through (iv)

We do not believe that this enhancement is appropriate as none of the above enumerated factors seem to apply to Mr. Duarte. At the time that he became involved in the instant offense, Mr. Duarte had two small businesses in Colombia. Between 1992 and 2004, he owned a small clothing factory and between 1983 and 2003, he purchased jewelry in New York and sold it in several South American countries. According to his Probation Report, these endeavors earned him approximately $2,700 per month (PSR, ¶¶ 53-54), which he used to support his wife and five children. Despite the government's characterization of Mr. Duarte in the indictment as a "money broker," Mr. Duarte has <u>always</u> worked in a legitimate business and has never engaged in any illegal conduct, but for the instant offense. Therefore, the defense does not believe that this is an accurate reflection of Mr. Duarte's role.

    **A.**     **Mr. Duarte did not regularly engage in the business of money laundering nor did he launder funds for an extended period of time.**

The first overt act in the indictment states that in late 1999, Mr. Duarte had a conversation with an undercover law enforcement officer regarding a meeting in New York to discuss money laundering. The next act in the indictment details offense conduct occurring on March 8, 2000 (another phone call between Mr. Duarte and the undercover). <u>All</u> of the following overt acts listed in the indictment for the year 2000 occur on five days in March (March 8, 9, 14, 24 and 28) and one in April (April 27). The next overt act does not occur until January 16, <u>2001</u> followed by acts on February 1, 2001 and September 27, 2001. <u>Over one year later</u>, on November 11, 2002, Mr. Duarte had a phone call with the undercover regarding a money delivery, followed by the

Hon. Thomas P. Griesa

September 22, 2005

actual delivery on November 14, 2002. The final overt act in the indictment occurred on January 28, 2003.

While the government may be quick to point out that not necessarily every act is alleged in the indictment, the ones that are included do not support the theory that Mr. Duarte was regularly engaged in the business of money laundering or engaged in the conduct for an extended period of time. While the conduct lasted from late 1999 through January 2003, it occurred sporadically and could not be described as a regular course of business for Mr. Duarte.

**B.    Mr. Duarte did not launder funds from multiple sources.**

In addition, there is no evidence that Mr. Duarte laundered funds from multiple sources pursuant to subsection (iii). This was one conspiracy with one group of people, including Mr. Duarte's brother, Miguel, several unnamed co-conspirators and what turned out to be an undercover law enforcement officer. Nothing in the indictment, discovery or Pre-Sentence Report indicates that Mr. Duarte was involved with either people or conspiracies separate and apart from the offense to which he pled guilty.

**C.    Mr. Duarte did not receive substantial revenue.**

Finally, while Mr. Duarte's financial motivation to engage in the offense conduct will be discussed below, the indictment clearly states that he received a percentage fee of the money laundering revenue. Mr. Duarte reported in a proffer session with the government that he received a fee of between one and two percent. In addition, Mr. Duarte's financial situation as detailed in paragraphs 55 through 59 of his Pre-Sentence Report belie the notion that he received a "substantial amount of revenue" for participating in the offense.

**D.    Subsections (iv) and (v) do not apply to Mr. Duarte.**

Mr. Duarte has no criminal history thereby making subsection (v) moot.

While he did speak and meet with undercover law enforcement officer on several occasions, we do not believe that subsections (i) through (iv) apply to Mr. Duarte thereby making subsection (vi) moot as well.

Hon. Thomas P. Griesa

3

September 22, 2005

Therefore, Mr. Duarte's Sentencing Guidelines level should be calculated as follows:

| | |
|---|---|
| Base Offense Level (pursuant to §2S1.1) | 8 |
| Loss (pursuant to §2B1.1(b)(1)(I) | +16 |
| Proceeds of Narcotics (pursuant to §2S1.1(b)(1)(i) | +6 |
| Convicted Under 18 U.S.C. §1956 (pursuant to §2S1.1(b)(2)(C) | +2 |
| Acceptance (pursuant to §3E1.1) | -3 |
| Total Offense Level | 29 |
| Criminal History Category I | |
| Range of Imprisonment | 87-108 |

## MITIGATING FACTORS

Your Honor has read Mr. Duarte's Pre-Sentence Report, as well as numerous letters from family and friends (provided to the Court under separate cover). While we believe that a more accurate range of imprisonment is 87-108 months, we do <u>not</u> believe that this is an appropriate sentence given Mr. Duarte's background and circumstances. Mr. Duarte is not the typical defendant standing before this Court and we would urge Your Honor to consider outside factors which may be relevant to a non-guidelines sentence pursuant to <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005). These factors in mitigation of sentence allow a District Court Judge to sentence the defendant standing before them and not simply sentence yet another defendant who, to use Mr. Duarte as an example, has been convicted of violating the money laundering statutes. While there are few circumstances that would have necessarily risen to the level of a downward departure prior to <u>United States v. Booker</u>, 125 S.Ct. 738 (2005), certain factors in Mr. Duarte's case should be taken into consideration by Your Honor in fashioning an appropriate sentence.

### Type of Offense

Mr. Duarte fully admitted during his guilty plea that he laundered the proceeds of narcotics transactions. However, the sentencing guidelines level calculated by Probation is the same as that calculated for the most serious of drug dealers. While we are not minimizing the offense or his conduct, had he been involved in a straight narcotics conspiracy, a base offense level of 33 would afford Mr. Duarte certain relief that is not available to him with a money laundering conviction.

Pursuant to U.S.S.G.§2D1.1(a)(3), a defendant in a drug case who has a base offense level of either 32, 34 or 38 and who has a Mitigating Role in the offense under U.S.S.G.§3B1.2 receives an appropriate adjustment. We are not arguing that Mr. Duarte should receive a role adjustment per se, however, he was in effect no more than a middleman. He was not a "money

Hon. Thomas P. Griesa
September 22, 2005

4

broker;" he was not "the boss"; he did not receive huge sums of money. In an early attempt to cooperate (to be discussed below), Mr. Duarte was only able to give information about the people with whom he dealt directly and about whom the government already knew. Mr. Duarte himself only elicited the help of one other person in the offense and that was his brother, Miguel. Had this been a drug case, we would have certainly attempted to take advantage of U.S.S.G. §2D1.1(a)(3).

In addition to a potential guidelines adjustment for a narcotics conviction, Mr. Duarte would also have been eligible for safety valve. He has never been arrested or convicted of a crime in his entire life. He is exactly the type of defendant (again, had this been a drug case) who safety valve was meant to help. While his criminal history is also a factor which Your Honor should take into consideration given that his conduct is truly a departure from his otherwise law-abiding life, Mr. Duarte clearly misses out on this avenue of relief as a "money launderer" and not a "drug dealer."

**Super Acceptance of Responsibilty**
Shortly after Mr. Duarte's arrest, the defense was approached about the possibility of cooperation. Two meetings were held in May 2004 during which Mr. Duarte provided the government with information about his role, the members of the conspiracy and how it operated. He explained that he received a 1-2% fee for participating in the money laundering and was originally approached because one of the members knew that he was having financial problems. The government believed that he was truthful, but described his information as useless in discussions with defense counsel. This is because, as discussed earlier, Mr. Duarte was only able to provide information about the people with whom he directly dealt. In effect, he had nothing new to bring to the table.

Although his efforts at cooperation were not enough to warrant an agreement, Mr. Duarte was willing and truthful, which are two of the most important qualities in a cooperator. A 5K letter is clearly inappropriate in this case, however, we would urge Your Honor to take his cooperation attempts into consideration at sentence.

**Motivation**
Mr. Duarte did not become involved in money laundering to support a drug habit or a luxurious lifestyle. Mr. Duarte was simply trying to support his family. Over a three year period, his gross income decreased from approximately $28,000 in 2001 to $11,501 in 2003. At the same time, his credit card debt increased dramatically and he currently owes almost $70,000 according to his Pre-Sentence Report. While he owned two business in Colombia, they did not make him a rich man. A lien was put on his house and, in 2003, the bank took possession of an apartment he owned. Immediately before his arrest, he filed for bankruptcy.

Hon. Thomas P. Griesa
September 22, 2005

Financial gain can certainly be considered as one of the main motivators in committing a crime. However, Mr. Duarte was not trying to gain anything by resorting to money laundering. He was trying to sustain what he had. As his son Charlie said in his letter to Your Honor:

> He had so many debts that the despair blinded him and that's why he made that mistake. He acted, desperately, without thinking on the consequences. He wanted to solve all his economical problems so that he and us, his family, could have a tranquil life.

While Mr. Duarte makes no excuses for his conduct, his motivation is one factor of many which make him an atypical defendant.

**Family and Background**

It is clear from the many letters of support from Mr. Duarte's friends and family that he is a much loved and cherished member of his family and community. He was raised in a close-knit family with ten siblings, all of whom received a good education and, most important, the love and support of their parents. All of his siblings, but for his brother and co-defendant, Miguel, continue to live in Colombia and have careers ranging from judges to accountants to business owners.

Perhaps Mr. Duarte's most important achievements, however, are his five beautiful children: oldest son, Charlie, and his five daughters, Paola (20), Jennifer (19), Anyela (17) and Stefani (15). Your Honor has certainly had an opportunity to observe the Duarte girls in Court and while Mr. Duarte has often expressed embarrassment and fear about his girls seeing him as a defendant, Paola, Jennifer, Anyela and Stefani want nothing more than to support their father as he has always supported them. In their letters to the Court, the girls recount tales of birthdays, Christmases and simple conversations with their father where he imparted life lessons that they carry with them to this day. Paola Duarte says:

> Many are the teachings that my father gave me. Many are the memories about happy moments that I shared with my father. Many are the moments that I remember being on the side with my father asking him questions and him answering them with a huge smile on his face. Many are the memories that I have with my father supporting me in both my educational and sport life. Many are the moments that I remember my father making me feel happy or better after a disappointment or a mistake. Many are the moments that I remember my father telling me not to do something because it was not good for me. Now, Your Honor, with this letter I would like to share and tell you some of those beautiful moments that after so many years I still keep in my heart. Why do I still keep them? Just because of the fact that those moments, which I shared with my father, have been the most happiest, beautiful and important moments of my life (Paola Duarte letter).

Hon. Thomas P. Griesa
September 22, 2005

Mr. Duarte always stressed the importance of education in his daughters' lives. When

6

Paola first told her father that she wanted to go to medical school, she remembers "looking at his face with his eyes, almost with tears, blushing and telling me how proud he was of me." Jennifer, Anyela and Stefani are on the swim teams at their respective schools and Stefani attributes their academic and athletic successes to one person: "thanks to my wonderful dad I had accomplished great things. Things such as being able to continue with my studies and of joining a swimming team and keep swimming, and thanks to him is that now we are an experts on swimming" (Stefani Duarte letter). During every visit with defense counsel, Mr. Duarte would share the successes of his daughters and smile shyly when told that it was because of his parenting that they are the women they are today.

Mr. Duarte also taught his daughters to be good citizens and good people. In fact, his greatest fear is not for himself or for his future, but rather for the future of his daughters. In the old days of downward departures, and even today as a mitigating factor, the Duarte girls would be perfect examples of "Extraordinary Family Circumstances." Not only are they currently without their father, but their mother is very ill and living in Colombia. The parental roles have become the responsibility of the two eldest children, Charlie and Paola. Like their father, they are trying hard to keep the family united, but as Jennifer Duarte explains: "this is the first time in my life that I have been separated from my daddy. Our family is used to be together" (Jennifer Duarte letter).

Finally, also warranting consideration is the fact that Mr. Duarte and his wife both suffer from health problems. Prior to his arrest, Mr. Duarte suffered from arthrosis, a degenerative muscular condition (different than arthritis), in his hands. He took special vitamins to combat both the pain and the disease, however, since his incarceration, no medication has been provided. Since the preparation of his Pre-Sentence Report, he was examined by a physician at the MDC and diagnosed with arthritis in his hip. He and his daughters report that he has suffered from constant pain for the last several weeks and there are times when he has difficulty walking. Mr. Duarte has also suffered from a herniated disc in his back for ten years.

Mrs. Duarte suffers from a serious stomach ailment that requires surgery in the immediate future. She is currently living in Colombia, away from her husband and four daughters, so that she can receive treatment. This puts an additional burden on Mr. Duarte as, in addition to being concerned about his wife's health and future, his daughters have no parents to care for them, talk to them, be parents to them on a daily basis. Stefani Duarte captures their longing for their father best:

> I miss the jokes and hugs of my daddy because he is a really funny and kind person. We had a lot of great times with all our family because of his jokes, because of his kindness, and because of the way he was and still is. We miss him. Our lives and home would never

Hon. Thomas P. Griesa
September 22, 2005

7

be the same without him. I miss and need his hugs, jokes, teachings and knowledge. Sir we really need our dad here with us. This situation is really sad for all of us ... I want, need and miss him a lot. I beg you please help us and lead [sic] us be with him once again (Stefani Duarte letter).

## CONCLUSION

Section 3553(a) of Title 18 of the United States Code states that the Court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes [of sentencing] … The purposes of sentencing are:

(A)    …just punishment for the offense;
(B)    …adequate deterrence…;
(C)    …protect the public…; and
(D)    …provide the defendant with needed educational or vocational training, medical care or other correctional treatment…

Taking all of the above factors into consideration, the defense respectfully requests that Your Honor impose a non-guidelines sentence. Mr. Duarte has been incarcerated since his arrest on April 2, 2004 and while we are not suggesting a particular sentence, we believe that the enumerated mitigating factors leave room for an appropriate sentence that adequately reflects the offense, but also considers the above purposes of sentencing. Anyela Duarte has faith that her father will not make the same mistake twice:

Your honor I know that my father is not perfect and as human he made mistakes. But he regrets the things that he did. He is not going to do those things again. If you give him another opportunity he is not going to disappoint you (Anyela Duarte letter).

I thank Your Honor for his consideration of this matter.

Very truly yours,

Marion A. Seltzer

cc:    Kevin Puvalowski, AUSA